J.H., By and Through his guardian ad litem, D.H., Plaintiff and Appellant,

v.

WEST VALLEY CITY, West Valley City Police Department, and Jene V. Lyday, individually and as a police officer of West Valley City, Defendants and Appellees.

No. 900052.

Supreme Court of Utah.

Oct. 7, 1992.

Richard I. Ashton, Wayne H. Braunberger, David A. Wilde, Murray, for D.H.

James M. Dunn, Michael N. Zundel, Laurie S. Hart, Salt Lake City, for Lyday.

Allan L. Larson, Richard A. Van Wagoner, Salt Lake City, for West Valley City and West Valley Police Dept.

HALL, Chief Justice:

Plaintiff J.H. appeals from an order of the Third Judicial District Court of Utah granting summary judgment to defendants West Valley City and West Valley City Police Department ("West Valley") and dismissing J.H.'s claims against those parties. We affirm.

J.H. filed claims against West Valley and defendant Jene V. Lyday for alleged injuries arising from sexual abuse that Lyday committed upon J.H. in April of 1986. Lyday was employed as a police officer by West Valley City Police Department at the time of the abuse. J.H. filed claims against West Valley for violation of his civil rights under 42 U.S.C. § 1983 based upon the City's "deliberate indifference" toward the rights of J.H. and the other citizens of West Valley City, for liability under the theory of respondeat superior, for negligence in hiring Lyday and later installing him as advisor to a law enforcement explorer post organized by the City, and for negligently placing Lyday in a position of trust and authority without adequate supervision. West Valley filed a motion for summary judgment, which was heard on October 30, 1989. The trial court granted the motion on the grounds that J.H. had failed to state a prima facie case against West Valley under any of his theories of recovery, that there was no genuine issue of material fact, and that West Valley was entitled to judgment as a matter of law. Because the summary judgment did not dispose of pending claims against Lyday, the trial court certified the disposition for appeal under rule 54(b) of the Utah

Rules of Civil Procedure. J.H. thereafter made a timely appeal to this court.

Our review of this case follows established standards for determining the appropriateness of summary judgment. Regarding questions of law, this court accords no deference to the trial court and reviews the trial court's decisions for correctness.[1] In reviewing factual issues, this court views the evidence and all inferences to be drawn therefrom in a light most favorable to the nonmoving party.[2] Our recital of the facts is based upon that standard.

Lyday was hired by the West Valley City Police Department in July of 1980 as part of West Valley's original recruitment of police officers. He was hired by Chief of Police David Campbell and Assistant Chief of Police Gerald Maughan. Prior to his position with West Valley, Lyday had served as a police officer for the Salt Lake City Police Department for seven years. During his tenure with the Salt Lake City Police Department, he became acquainted with both Campbell and Maughan, who also served in that department. Campbell was also personally acquainted with Lyday through a mutual religious affiliation.

As part of the application process, Lyday was required to take a physical agility test and a written test. He was interviewed by Campbell and Maughan and was required to fill out a personal statement form that the hiring officers reviewed. This form required that Lyday reveal any prior conduct that would disqualify him from police work. A background investigation of Lyday and all other applicants included a search for prior criminal activity, a fingerprint analysis and criminal activity search with the FBI, a search of the applicant's driving and credit records, and a check for satisfactory prior employment. No attempt was made to verify the information on the personal statement form. No interviews were made of family, friends, or associates of Lyday. No psychological tests were performed to uncover violent tendencies or deviant characteristics. No

other psychological or physical examinations were performed.

Attached to his motion in opposition to summary judgment, J.H. submitted the amended affidavit of Dr. Arthur Brown, a licensed marriage and family therapist and psychologist. Brown opined that if psychological tests had been performed on Lyday before he was hired or placed in charge of the explorer program, these tests would "most likely" have revealed Lyday's deviant characteristics.

Lyday was appointed to the Public Relations Department of the police department in 1984. As the officer in charge of public relations, he functioned as advisor to the Law Enforcement Explorer Scout Program ("the explorer program"). This program was instituted to improve public relations, encourage law enforcement careers among participants, and provide a positive program in the community for adolescents. Lyday's duties with respect to the explorer program included coordinating explorer education and training sessions, coordinating explorer activities and social events, supervising explorers when they were called upon to assist police officers in traffic control or other duties, coordinating a "ride along" program in which explorers were allowed to ride with West Valley police officers as they performed their regular duties, and coordinating explorer participation in public service activities such as safety presentations and mall demonstrations. Occasionally, after explorer activities, Lyday provided transportation home for some of the explorers in the program. He was paid for his coordination and supervision activities with this program. He included time spent with the explorers, whether for regular police activity or social activities or demonstrations, as part of his on-duty police time with West Valley. It is unclear whether time spent transporting explorers home from explorer activities was counted as on-duty time by Lyday.

1. *Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1040 (Utah 1991); *City of Monticello v. Christensen,* 788 P.2d 513, 516 (Utah 1990).

2. *Clover,* 808 P.2d at 1039; *Beach v. University of Utah,* 726 P.2d 413, 414 (Utah 1986).

When Lyday was placed in charge of the explorer program, he did not receive additional training or instruction on dealing with youths, nor was he required to undergo any additional testing or background check. As the explorer advisor, he was not observed or supervised by any other person during the performance of his duties.

J.H.'s involvement with the explorer program began in October 1985. He joined the explorer program because of his interest in police work and his desire to make police work his career. Upon acceptance into the program, J.H. was informed that he was to strictly obey all police officers working with the program. He was also told that the program was under Lyday's control. He and other members of the explorer program were advised to follow Lyday's directions and instructions or they could be dismissed from the program.

On April 10 and April 17, 1986, Lyday sexually molested J.H. The conduct occurred in a patrol car while Lyday was driving J.H. home following explorer activities. Lyday committed the acts after telling J.H. that he was teaching him standard and accepted relaxation techniques which police officers relied upon to deal with job-related stress. After the second molestation, J.H. notified his parents and the authorities of the abuse. The Salt Lake County Sheriff's Department and West Valley investigated the complaints. Lyday resigned from his position in May 1986. He was formally charged with two counts of forcible sexual abuse[3] and pleaded guilty to one count of attempted forcible sexual abuse. On October 7, 1987, J.H. filed the instant claims against Lyday and West Valley.

## I. VIOLATION OF CIVIL RIGHTS UNDER SECTION 1983

J.H.'s first claim is that his civil rights were violated by Lyday's conduct against him. He brings suit under 42 U.S.C. § 1983, which states:

Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.[4]

The United States Supreme Court has ruled that under certain circumstances, a municipality may be sued as a "person" for violating a citizen's rights. In *Monell v. New York City Department of Social Services*,[5] the Court held that to establish a claim for violation of civil rights against a municipality under section 1983, the violation complained of must arise out of the official acts of the municipality or under a governmental custom or policy, even though such custom may not have received formal approval through the body's decision-making channels.[6] Liability against a municipality will not lie merely on the basis of respondeat superior or on the unofficial acts of the municipality's employees.[7]

Subsequent cases have clarified the requirements for establishing section 1983 liability against a municipality for the acts of its employees. First, the injury to rights must have been committed under color of state law.[8] There is no constitutional right to protection from the actions of private citizens.[9] To show that an injury

---

**3.** Utah Code Ann. § 76–5–404. Forcible sexual abuse is a second degree felony.

**4.** 42 U.S.C. § 1983 (1986).

**5.** 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**6.** *Id.* at 690–91, 98 S.Ct. at 2035–36.

**7.** *Id.* at 691, 98 S.Ct. at 2036.

**8.** *See DeShaney v. Winnebago Social Servs.,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989); *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980).

**9.** *DeShaney,* 489 U.S. at 195, 109 S.Ct. at 1002; *see D.T. by M.T. v. Independent School Dist. No. 16,* 894 F.2d 1176, 1186 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990); *Thomas v. Cannon,* 751 F.Supp. 765, 767 (N.D.Ill.1990).

was committed under color of state law, a plaintiff must show that the actor was either a public official who can be said to act for the municipality or an employee of the municipality who acted according to a law, custom, or usage known to and acquiesced in or condoned by the municipality.[10]

In *Canton v. Harris*,[11] the Court held that a custom or usage may result from failure to train city police officers if that failure amounts to deliberate indifference to a known constitutional right of a plaintiff or the citizens of the municipality.[12] Further clarifying the meaning of the term "deliberate indifference," the Court stated:

> Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As Justice Brennan's opinion in Pembaur v. Cincinnati put it: "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality— a "policy" as defined by our prior

cases—can a city be liable for such a failure under § 1983.[13]

Although *Canton* involved a custom or policy of inadequate training of police officers, the deliberate indifference standard articulated in *Canton* is also readily applicable to a municipal policy or custom of failing to adequately screen and hire applicants.[14] Although it seems unlikely that a municipality would have a policy of inadequate hiring practices, in light of the duties assigned to police officers and to specific officers on a police force, a need for additional testing and screening of applicants for positions as officers may be facially obvious. If so, the violation of rights resulting from inadequate screening may be so inevitable that the officials who ignored or failed to identify the need may be said to have been deliberately indifferent to it.[15] However, an isolated incident involving failure to screen an applicant will not be sufficient to show that the city's policy violated a plaintiff's rights.[16] Thus, to show that a city was deliberately indifferent in its hiring practices, actual knowledge of the applicant's problems and their relationship to the damage caused or a widespread pattern of hiring police officers with violent or deviant tendencies must be established.[17]

---

**10.** *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037; *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *D.T. by M.T.,* 894 F.2d at 1186; *Thomas,* 751 F.Supp. at 769.

**11.** 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

**12.** *Id.* at 388, 109 S.Ct. at 1204. Since the issue has not been raised, we do not address whether there is indeed a constitutional right to be free from molestation. Plaintiff argued that the molestation by Lyday violated his right to privacy. Other courts have held that molestation or assault by a state actor violates a person's substantive due process right to liberty and personal freedom. *See, e.g., Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 726–27 (3d Cir.1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990); *Wood v. Ostrander,* 879 F.2d 583, 588–89 (9th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *Wassum v. City of Bellaire,* 861 F.2d 453, 454–55 (5th Cir.1988). *See generally Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51

L.Ed.2d 711 (1977) ("Among the historic liberties so protected was a right to be free from . . . unjustified intrusions on personal security."); *Black v. Stephens,* 662 F.2d 181, 188 (3d Cir. 1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982) (law enforcement officer's infliction of personal injury on a person may deprive victim of Fourteenth Amendment "liberty").

**13.** *Canton,* 489 U.S. at 389, 109 S.Ct. at 1205 (citations omitted).

**14.** *See, e.g., Wassum,* 861 F.2d at 455–56; *Stokes v. Bullins,* 844 F.2d 269, 274–75 (5th Cir.1988); *D.T. by M.T.,* 894 F.2d at 1192–93.

**15.** *See Canton,* 489 U.S. at 390, 109 S.Ct. at 1205 (articulating similar standard for need to train police employees).

**16.** *Id.* at 390–91, 109 S.Ct. at 1205–06.

**17.** *See Wassum,* 861 F.2d at 456; *Stokes,* 844 F.2d at 275.

In articulating the parameters of municipal liability for failure to train police officers under section 1983, the Court in *Canton* required that a close relationship exist between the deficiency in city policy and the resulting injury. In defining this close nexus for causation purposes, the Court stated:

> Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. . . .
>
> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something that the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities— a result we rejected in Monell.[18]

■ Thus, a plaintiff has a higher burden to show that the policy of the municipality was the moving force, or active cause, of the deprivation of the plaintiff's constitutional rights. This proof of causation, which is more than "but for" causation, must be an active, proximate cause of the harm.[19]

■ Applying the above standards to the present case, we first examine whether Lyday's molestation of J.H. provides a legal basis for liability against West Valley. It cannot be said that the City is automatically liable for Lyday's actions in molesting J.H. merely because Lyday was a West Valley employee.[20] It is not contended, nor do the facts demonstrate, that in committing the molestation, Lyday was acting as a policy maker of the City or according to a West Valley custom. Therefore, his acts are not fairly attributable to West Valley, and the City should not be held liable for them.[21]

■ However, plaintiff's section 1983 claim is based not only on the actions of Lyday, but also on the actions of Lyday's superiors in the police department. Plaintiff has asserted that Campbell and Maughan violated his rights through their custom and practice of hiring police officers without adequately checking into applicants' backgrounds and psychological fitness. Plaintiff has shown that Campbell and Maughan were officials of West Valley with policy-making authority with regard to its police department and any hiring practices or decisions there. Therefore, policies regarding hiring made by these individuals may be fairly attributable to West Valley.

■ When the record is viewed in a light most favorable to plaintiff, it also shows that the procedures used by Campbell and Maughan in evaluating Lyday's application for employment with West Valley were in accordance with the normal policies, customs, and procedures used to evaluate police applications at the time Lyday was hired. Although West Valley has denied that it was negligent in hiring Lyday, it has not specifically denied that the procedures used to evaluate Lyday's application were the customary procedures used for all police applications. However, the affidavits of Campbell and Maughan detailing the procedures used in hiring Lyday indicate that the procedures followed the normal routine of the department.[22]

---

**18.** *Canton,* 489 U.S. at 391–92, 109 S.Ct. at 1206 (citations omitted).

**19.** *Id.* at 393, 109 S.Ct. at 1207 (O'Connor, J., concurring).

**20.** *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037.

**21.** *Id.* at 691, 98 S.Ct. at 2036.

**22.** Maughan stated with respect to the hiring of Lyday:

> 10. One of my assignments as the Assistant Police Chief was to conduct background investigations on applicants to the West Valley City Police Department. The background investigations included searches for prior criminal activity, for criminal activity through fingerprint analysis with the F.B.I., for driving record and driver's license, and for satisfactory prior employment. It also included an extensive personal statement form to be filled out by the applicant and reviewed by the

However, plaintiff has failed to establish that the remaining requirements for making a claim under section 1983 have been met. Under *Canton*, plaintiff must also show that the custom or practice used in hiring police officers for West Valley was deliberately indifferent to his rights and that this indifference actually caused his injury. Plaintiff has failed to establish either of these elements.

First, he has failed to establish that West Valley's custom or practice for hiring police officers was a violation of section 1983 as defined by *Canton* and *Wassum*. The record, taken in a light most favorable to plaintiff, does not show an indifference on the part of West Valley that could be equated with a conscious choice not to act. The record shows no evidence of knowledge on the part of West Valley that Lyday had a sexually deviant character or was likely to behave violently or to molest plaintiff. Further, there is no evidence of a pattern of hiring police officers with violent or deviant behaviors or characteristics. At most, plaintiff has demonstrated that further screening procedures for prospective employees existed that West Valley did not use. The decision not to use such procedures, whether conscious or not, does not alone rise to the level of deliberate indifference necessary to establish liability under section 1983.[23]

Second, plaintiff has not made a legally sufficient showing of causation to establish liability under section 1983. The relationship between West Valley's hiring practices in 1980 and the alleged violation of plaintiff's rights in 1986 is tenuous at best.[24]

J.H. has not established the close nexus between city policy and his damages as required by *Canton*. Therefore, his claim under that section must fail.

## II.  RESPONDEAT SUPERIOR

Plaintiff next argues that West Valley should be held liable for the actions of Lyday under the doctrine of respondeat superior. We have previously held that there are three basic elements for determining whether an employee is acting within the scope of his or her employment for purposes of respondeat superior liability.[25] First, the employee's conduct must be of a general kind and nature that the employee is hired to perform. The employee's acts must be generally directed toward the accomplishment of the employee's duty and authority.[26] Second, the conduct must occur within the hours of the employee's work and the ordinary spatial boundaries of the employment.[27] Third, the employee's conduct must be motivated, at least in part, by the purpose of serving the employer's interest.[28] The employee's intent, however misguided in its means, must be to further the employer's business interests. "If the employee acts 'from purely personal motives ... in no way connected with the employer's interests' or if the conduct is 'unprovoked, highly unusual, and quite outrageous,' then the master is not liable." [29]

The question of whether an employee is acting within the scope of his employment for purposes of respondeat superior liability is a question of fact that must normally

---

hiring officers, which form inquired of prior conduct of a disqualifying nature.

11. With respect to Mr. Lyday, I conducted the above-described background investigation. Affidavit of Gerald Maughan, ¶¶ 10–11 (submitted in support of West Valley City and West Valley City Police Department's motion for summary judgment).

The affidavit of David Campbell is substantially in accord with respect to the hiring procedures of the department and its compliance with those procedures in hiring Lyday.

23. *See Wassum*, 861 F.2d at 456–57.

24. *See D.T. by M.T.*, 894 F.2d at 1192–94 (relationship to hiring practices was tenuous where

molestations took place more than three years after teacher was employed).

25. *Birkner v. Salt Lake County*, 771 P.2d 1053, 1056–57 (Utah 1989).

26. *Id.*

27. *Id.*

28. *Id.*

29. *Id.* at 1087 (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 70, at 506 (5th ed. 1984)); *see also Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 156–57 (Utah 1991).

be submitted to a jury.[30] However, "in situations where the activity is so clearly within or without the scope of employment that reasonable minds cannot differ, it lies within the prerogative of the trial judge to decide the issue as a matter of law."[31]

Applying the above standards to the present case, plaintiff has shown that the molestations occurred within the general spatial and time limitations of Lyday's employment. The record shows that Lyday was a West Valley employee assigned to perform duties with the explorer post. When the events in question occurred, he was on duty. He was obligated to supervise the explorers in the mall activities that had just concluded. It is apparent, at least, that the city acquiesced in Lyday's occasional provision of transportation to explorers participating in the activities. The molestation itself occurred in his patrol car, which had been issued for his use by West Valley. Therefore, J.H. has met the second part of the test for determining respondeat superior liability under *Birkner.*

■■■ However, the molestations committed by Lyday were clearly outside the scope of his employment. Plaintiff has not alleged any facts supporting the conclusion that at the time the molestations occurred, Lyday was engaged in conduct of a general kind and nature that he was employed to perform. Lyday was obviously not hired to perform sexual nature on the explorers under his supervision. Plaintiff argues that Lyday was employed to instruct and direct them in areas involving police work and that his actions in molesting J.H. were carried out pursuant to this type of instruction and supervision. This argument fails, however, because it is not the instruction and supervision by Lyday of which J.H. now complains. Lyday was not hired or authorized to instruct the explorers in sexual matters, nor was he authorized to touch the explorers in any manner. His acts of molestation were not in any way part of the instruction and supervision of the explorers but were in fact a complete abandonment of that instruction and of his employment.[32] Therefore, reasonable minds could not differ in determining that the touching or molestation was not within the general nature of work Lyday was hired to perform.

■■■ Plaintiff has likewise failed to allege sufficient facts to meet the third criterion of *Birkner.* No record evidence exists that would lead reasonable minds to conclude that Lyday was acting in the interest of West Valley when he committed acts of molestation on plaintiff. Lyday admitted that he committed the acts for his own personal gratification and that he knew the acts were prohibited by law and outside the bounds of his employment. West Valley received no benefit from the acts, and Lyday did not intend West Valley to benefit from his acts. There was no motivation, even in part, to serve the employer's interest. Therefore, the third criterion has not been met, and plaintiff's claim for respondeat superior was properly dismissed upon the granting of defendant's motion for summary judgment.

## III. NEGLIGENT HIRING

■■■ Plaintiff next claims that West Valley was negligent in hiring Lyday without conducting more extensive background checks, verifying information on his per-

---

**30.** *Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1040 (Utah 1991); *see also Carter v. Bessey,* 97 Utah 427, 93 P.2d 490, 493 (1939).

**31.** *Clover,* 808 P.2d at 1040; *Birkner,* 771 P.2d at 1057. *See generally Dwiggins v. Morgan Jewelers,* 811 P.2d 182, 183 (Utah 1991) (regarding resolution of negligence issues upon summary judgment).

**32.** When an employee's acts result in an abandonment of his employment, damage resulting from that abandonment is not the responsibility of the employer. *See Birkner,* 771 P.2d at 1057–

58; *Carter,* 93 P.2d at 492–93; *see also Andrews v. United States,* 732 F.2d 366, 370 (4th Cir. 1984); *Doe v. United States,* 618 F.Supp. 503, 506 (D.S.C.1984), *aff'd,* 769 F.2d 174 (4th Cir. 1985); *Milla v. Tamayo,* 187 Cal.App.3d 1453, 1462, 232 Cal.Rptr. 685, 690 (1986); *Community Theatres Co. v. Bentley,* 88 Ga.App. 303, 76 S.E.2d 632, 634 (1953); *Hoover v. University of Chicago Hosp.,* 51 Ill.App.3d 263, 9 Ill.Dec. 414, 418, 366 N.E.2d 925, 929 (1977) (where employers are not held liable for acts of sexual conduct committed by their employees).

sonal statement through interviews, or conducting psychological testing. Regardless of whether an employer may be held liable under the doctrine of respondeat superior, an employer may be directly liable for its acts or omissions in hiring or supervising its employees.[33] The trial court granted defendants' motion for summary judgment on this claim, stating that plaintiff had failed to state a prima facie case of negligence against defendants. To state such a case, plaintiff must show that West Valley had a duty to protect him from harm at the hands of its employees, a negligent breach of that duty, and the harm and damages caused by that breach.[34] Plaintiff's claim for negligent hiring was properly dismissed because plaintiff failed to present sufficient evidence to show the element of proximate causation.[35]

Plaintiff has not established that West Valley's failure was the cause of his harm. He has produced no evidence that West Valley knew or had reason to know that Lyday had deviant characteristics that would make him a risk as a police officer or while working with youths. Campbell and Maughan produced affidavits stating that they had previously worked with Lyday and had no reason to know that he had deviant characteristics. Further, plaintiff has produced no evidence that Lyday did or said anything prior to his molestation of plaintiff that would have put West Valley on notice that he had a propensity to commit such acts. Indeed, plaintiff has not produced any evidence to create a factual issue as to whether Lyday's problem even existed prior to the time he was hired by West Valley or was placed in charge of the explorers. The facts alleged do not establish the connection between West Valley's hiring practices in 1980 and Lyday's actions in 1986.

■ Plaintiff attempts to circumvent the lack of causation for his claim through expert testimony relating to the detection of sexual deviancy. He asserts that West Valley's hiring practice of not conducting sexual deviancy testing on Lyday caused Lyday to be wrongfully or negligently hired and subsequently caused plaintiff's injuries at the hands of Lyday. In support of this claim, plaintiff produced the affidavit of Dr. Arthur Brown stating that if psychological tests designed to detect sexual deviance and the potential for sexual abuse behavior had been administered, such tests would "most likely" have revealed Lyday's sexually deviant characteristics. Brown's affidavit fails in several respects. First, it merely asserts that one of the tests, the MMSI, was available two years prior to the time of the affidavit. It does not assert that either of the suggested tests for sexual deviancy and propensity for sexual abuse behavior was available at the time Lyday was hired.[36] Second, the affidavit fails to assert that Lyday's deviancy or propensity to commit sexual abuse existed or probably existed at the time he

---

33. *Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1048 (Utah 1991); *see also Birkner v. Salt Lake County,* 771 P.2d 1053, 1059 (Utah 1989); *Stone v. Hurst Lumber Co.,* 15 Utah 2d 49, 386 P.2d 910, 911–12 (1963); W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 70, at 501–02 (5th ed. 1984).

34. *See, e.g., Williams v. Melby,* 699 P.2d 723, 726 (Utah 1985).

35. *See Dowell Div. of Dow Chem. U.S.A. v. Del–Rio Drilling Programs, Inc.,* 761 P.2d 1380, 1384 (Utah 1988); *Jackson v. Hicks,* 738 P.2d 1037, 1039 (Utah 1987).

36. The paragraphs of Brown's amended affidavit dated October 12, 1989, relating to the psychological testing state as follows:

7. The Minnesota Multiphasic Personality Inventory (MMPI) and the Multiphasic Sexual Inventory (MMSI) are examples of psychological tests which are appropriately administered by police departments and other agencies.

8. The MMPI takes three to four hours to administer and includes a sexual deviance scale.

9. The Multiphasic Sexual Inventory *available for the last two years* is a psychological test which requires approximately two hours to administer. This test detects potential sexual offense perpetrators.

. . . .

12. It is also my professional opinion that had either of these test [sic] or a similar psychological test been administered to the Defendant, Jene Lyday, his deviant sexual personality would most likely have been detected.

(Emphasis added.)

was hired, when the tests would have been administered. Third, it fails to predict how those tests would relate to the behavior of which plaintiff complains. Fourth, Brown's affidavit does not assert that Lyday's deviancy could have been predicted to a degree of reasonable medical certainty; it merely asserted that the tests would have "most likely" shown some deviancy.[37] Therefore, the affidavit is facially inadequate to create a factual issue that failure to administer the tests more than six years prior to the incident in question could somehow have caused the incident. Plaintiff has failed to state a prima facie case of negligence by failing to sufficiently allege that defendants' acts caused his damages. Hence, the trial court's award of summary judgment to defendants on plaintiff's claim of negligent hiring is appropriate.

In so holding, we do not negate the importance of adequate hiring and screening procedures in our state's police departments. Hiring and maintaining employees with demonstrated mental fitness and integrity is especially important in an area such as a police department where officers are given a high degree of authority. Police officers regularly have one-on-one contacts with private citizens in a variety of situations. During these contacts, it is necessary and desirable that the officers maintain authority over the citizens they encounter and that the citizens obey and respect that authority.[38]

The legislature of this state has recognized the great authority bestowed upon police officers and the need for public respect for and trust in that authority and, accordingly, has created a corresponding duty on the part of a hiring agency to examine a prospective officer's mental fitness to perform his duty. In 1980, at the time Lyday was hired by West Valley, Utah Code Ann. § 67–15–6 required:

> Every applicant for admission [for training as a police officer] shall meet the following standards and requirements before being admitted:
>
> . . . .
>
> (7) free of any physical, emotional, or mental condition that might affect adversely the performance of duty as a peace officer.[39]

■■■ This statute requires that an employer take measures to determine that its police officers are mentally competent. It does not, however, require any particular procedure or test for determining mental and emotional stability, nor does it state what measures must be taken. We decline to read section 67–15–6 as creating a private right of action for failure to follow any specific procedure in hiring police officers. However, failure to conduct *any* checks or testing to ensure that an officer is mentally fit as required by the statute may be evidence of negligence in a city's hiring practices.[40]

## IV. NEGLIGENT SUPERVISION

■■■ Finally, plaintiff claims that West Valley was negligent in placing Lyday in a position of trust without providing adequate supervision or observation of his activities. The trial court held that plaintiff had not stated a prima facie case of negligence against West Valley and granted West Valley's motion for summary judgment, dismissing this claim.

---

37. *See supra* note 36.

38. Indeed, we have recently held that failure to respect an officer's authority, even when the officer is acting illegally, may result in criminal liability for the citizen who resists the officer's acts, so long as the acts of the officer are not outside the bounds of his duty. *State v. Gardiner*, 814 P.2d 568, 574 (Utah 1991). This, combined with the instant case, requires a citizen faced with illegal police action to submit to the action or face potential criminal penalties if the action of the police officer is later found to be within the scope of his authority.

39. This section was amended and renumbered, effective January 1988. *See* 1988 Utah Laws ch. 135, § 1. The current version of the applicable section is found at Utah Code Ann. § 67–15–6(1)(h).

40. Due to our holding that plaintiff has failed to show causation for his injuries, we decline to express an opinion as to whether plaintiff's claim that psychological tests should have been conducted is sufficient to state a claim under section 67–15–6.

■ To state a prima facie case of negligent supervision or retention of Lyday, plaintiff was required to show that West Valley had a duty to supervise and direct Lyday in a manner so as to protect persons from acts of violence or molestation by him. To prove that such a duty existed, plaintiff was required to show that such acts were foreseeable.[41] There is no duty to protect persons from unforeseeable risks of harm at the hands of another.

Plaintiff states his case too narrowly by arguing that violent or deviant conduct by Lyday in particular must have been foreseeable. Plaintiff has not shown that violent or deviant conduct toward the explorers by *any* of West Valley's officers was foreseeable. Other cases in which we have found that a claim may lie for negligent supervision show the distinction between known or foreseeable dangers and unknown, unforeseeable dangers.

In *Clover v. Snowbird Ski Resort*,[42] we held that a material issue of fact existed regarding Snowbird's negligent supervision of its employees, precluding summary judgment. In *Clover*, the plaintiff was injured when a Snowbird employee skied over a jump at the resort and collided with the plaintiff, causing her injuries. In support of her negligent supervision claims, Clover presented evidence that Snowbird provided ski passes to its employees as part of their compensation package and that Snowbird was aware of the dangerous condition created by the ski jump and was aware that its employees often took the jump, but did not take any measures to prohibit its employees from taking the jump or to alleviate the danger.[43]

In contrast, the plaintiff in the instant case has failed to sufficiently allege or prove that West Valley was negligent in supervising the explorer post. West Valley had no notice of any problem with Lyday or with any of the officers. West Valley had no reason to know that it should take special precautions when supervising Lyday. Lyday had served in the Salt Lake City and West Valley police forces for many years with an unblemished record. West Valley had no prior problems of a sexual nature between other members of its police force and the explorer post. West Valley had no reason to know that problems of this type existed in the program. Absent this knowledge, West Valley had no duty to take special supervisory measures.

Plaintiff's suggestion that other measures could have been taken to protect youths in the program from the officers is unreasonable and speculative. The supervision of the explorer program was consonant with the program's purposes and with reasonable standards of supervision. The post was arranged to give the explorers one-on-one interaction with the police officers employed by West Valley and to teach the explorers about the responsibilities of being a police officer. The instructions given by Lyday were merely a part of the program, which was highlighted by a "ride along" activity where the youths shadowed the officers on their daily routes. A requirement of constant supervision of all officers participating in the program would destroy the program's objectives. To so burden the explorer program without notice of a special need and absent knowledge of any problem between the officers and the youths would be unreasonable.

■ Plaintiff has also failed to allege facts establishing that any act or omission of West Valley was a proximate cause of his damages. Nothing indicates that more or different supervision or rules concerning the explorer program would have had a different effect on Lyday's conduct. He admitted that he knew his conduct was illegal and against the rules and standards of West Valley. Therefore, it is not reasonable to assume that additional rules would have had any effect on him.

We therefore hold that no genuine issue of material fact exists and that defendants West Valley City and the West Valley City Police Department are entitled to judgment

---

41. *See, e.g., Stone v. Hurst Lumber Co.*, 15 Utah 2d 49, 386 P.2d 910, 912 (1963).

42. 808 P.2d 1037 (Utah 1991).

43. *Id.* at 1048.

as a matter of law. We affirm the trial court's decision granting summary judgment to defendants on each of plaintiff's claims.

STEWART, J., concurs.

ZIMMERMAN, Justice (concurring).

I concur in the Chief Justice's opinion, except that as to part II, which treats the respondeat superior issues, I find no occasion to consider whether there is a question of material fact as to whether Lyday's activities were within the scope of his employment. For the purposes of this appeal, it is sufficient to note, as the Chief Justice does, that plaintiff has not alleged sufficient facts to satisfy the third criterion of *Birkner v. Salt Lake County*, 771 P.2d 1053, 1057 (Utah 1989).

HOWE, Associate Chief Justice (dissenting).

I would reverse the summary judgment granted to West Valley City on a ground that was briefed by plaintiff but has not been separately considered in the majority opinion.

The City may be liable because it clothed Lyday with apparent authority to commit the offensive acts on plaintiff. Under section 265 of the Restatement (Second) of Agency:

(1) A master or other principal is subject to liability for torts which result from reliance upon, or belief in statements or other conduct within an agent's apparent authority.

(2) Unless there has been reliance, the principal is not liable in tort for conduct of a servant or other agent merely because it is within his apparent authority or apparent scope of employment.

Restatement (Second) of Agency § 265 (1957).

The City invested in Lyday complete control of the explorer program and invited young people in the area to participate. Many of the participants were interested in careers in law enforcement. Lyday taught them about police work in weekly meetings held in the city hall. On police department letterhead, each of the participants in the post was required to commit in writing full allegiance to Lyday's directions and orders. Disobedience could result in discipline or even expulsion from the post. The abuse here was committed under the guise of Lyday's teaching plaintiff standard relaxation techniques for police officers. According to plaintiff, Lyday told him that police work was stressful and that it was important to learn relaxation techniques. Lyday then demonstrated the technique by massaging plaintiff's arm, leg, neck, and chest. On a later occasion, Lyday massaged an area closer to plaintiff's genitals and, still later, actually touched his genitals. Plaintiff, being young and obedient, did not resist. The abuse occurred in a police car when Lyday was on duty, as he was taking plaintiff home from post meetings or activities. Lyday may have been in his police uniform. He testified in his deposition that it was within his job description to take participants home when necessary and convenient. A jury could reasonably find that the 15–year–old plaintiff had no reason to doubt his leader's representations and reasonably relied upon them.

In this situation, the City would be liable for Lyday's tort. An annotation by W. W. Allen summarizes the cases on the subject:

The cases which have involved the point fairly show that if a servant issues a direction or order which falls within the apparent scope of his authority in doing the work of his master, the latter may ordinarily be held liable for injuries proximately resulting to one who acts on the direction or order, and this notwithstanding it was given contrary to instructions or without actual authority.

W. W. Allen, Annotation, *Doctrine of Apparent Authority as Applicable Where Relationship is that of Master and Servant*, 2 A.L.R.2d 406, 419 (1948). The cases cited in the annotation point out that liability of a master based on the apparent authority of his servant to commit a tort is narrowly applied. Usually the injured party cannot demonstrate that he submitted to the tort (especially if it was intentionally inflicted) in reliance on any authority of the

servant. Said the court in *Smith v. Polukey*, 22 Ill.App.2d 238, 252, 160 N.E.2d 508, 515 (1959), "In the usual personal injury case, the injured person does not rely upon apparent authority of any kind in getting hurt." However, when deceit is engaged in by an employee and the injured person is young or inexperienced and reasonably relies upon that employee's order or direction, all the necessary elements are present to impose liability on the employer. An illustration provided in section 265 of the Restatement (Second) of Agency is helpful in demonstrating this point:

> P discharges A, his foreman, who regularly directs those under him where to cut timber. Before the employees have been told of A's discharge, he tells them to cut trees on B's land, which they do. P is liable for the trespass.

Restatement (Second) of Agency § 265, illus. 1 (1957).

Employers have been held liable for injuries sustained by persons who have relied on orders, directions, permissions, and invitations extended by employees acting within the apparent authority with which they have been clothed by their employers. Liability has been imposed notwithstanding that the order, direction, permission, or invitation was contrary to instructions given the employee or without actual authority. 2 A.L.R.2d at 419–20. Moreover, employers have been held liable where employees have extended invitations to third persons to enter nonpublic areas of stores and hotels or to ride on a train or automobile which resulted in injuries. 2 A.L.R.2d at 419–20, 425–28. Liability is not defeated because the employee's act is of no benefit to the employer. Restatement (Second) of Agency § 262 (1957).

The doctrine of apparent authority has its roots in equitable estoppel. "[I]t is founded on the idea that where one of two persons must suffer from the wrong of a third[,] the loss should fall on that one whose conduct created the circumstances which made the loss possible." 2 A.L.R.2d at 408; *see also Mobil Oil Corp. v. Frederick*, 615 S.W.2d 323, 325 (Tex.Civ.Ct.App.),

*rev'd on other grounds*, 621 S.W.2d 595 (Tex.1981).

Our decision in *Birkner v. Salt Lake County*, 771 P.2d 1053 (Utah 1989), does not preclude liability by the City. It was not a case of "apparent authority." Justice Stewart, writing for the court, carefully pointed out, "Neither Birkner nor Flowers thought their sexual interaction was part of therapy—the service that Flowers was hired to provide." *Id.* at 1058. No deception was employed by Flowers. In the instant case, Lyday knew that his touching plaintiff was not part of the training he was to give, but plaintiff, being deceived, was not so informed. Another important distinction is that the victim in *Birkner* was an adult, whereas the plaintiff here was only 15 years of age. Because of his youth, a jury could find plaintiff's reliance on Lyday's representation and conduct entirely justifiable. Lastly, Salt Lake County had done nothing to clothe Flowers with any apparent authority to commit the offensive acts on Birkner.

In summary, the City clothed Lyday with authority to teach the young participants principles and procedures of police work. They were sworn to follow his direction. While teaching plaintiff, Lyday, by deceit, induced plaintiff to submit to abuse, representing that it was part of the instruction. Plaintiff, being obedient, did not at the time question or resist the officer's advances. If his reliance was justifiable, the City is liable for the tort. *See Camp v. Hall*, 39 Fla. 535, 22 So. 792 (1897) (where the reliance of a child on the order of foreman to engage in certain dangerous work was held to be reasonable).

DURHAM, J., concurs in the dissenting opinion of HOWE, Associate C.J.

DURHAM, Justice (dissenting).

I dissent. I would follow the reasoning of a minority of courts which have held that actions by police officers carried out by virtue of their status may constitute acts "under color of state law" for purposes of the federal Civil Rights Act. In *York v. Story*, 324 F.2d 450 (9th Cir.1963), the court held that a complaint alleging

that police officers ordered a complaining witness to strip, photographed her in the nude, and circulated the photographs to other officers should not have been dismissed for failure to state a cause of action under 42 U.S.C. § 1983. The court said:

> The facts alleged in a complaint are sufficient ... if they lay a groundwork for proof that, at the time in question, the defendant was clothed with the authority of state or local government and *was purporting to act thereunder.*

324 F.2d at 453 (emphasis added).

Furthermore, I would extend similar reasoning to the question of vicarious liability on the part of government for police misconduct accomplished by means of the authority with which government clothes law enforcement officers. The California Court of Appeal held that a police officer was acting within the scope of his employment when he stopped a motorist, placed her in his patrol car, threatened her with rape and murder, and sexually assaulted her. *White v. County of Orange*, 166 Cal. App.3d 566, 212 Cal.Rptr. 493 (1985). The court held that the foregoing actions were "incident to" the officer's official duties:

> A police officer is entrusted with a great deal of authority.... [T]he police officer carries the authority of the law with him into the community. The officer is supplied with a conspicuous automobile, a badge and a gun to ensure immediate compliance with his directions. The officer's method of dealing with this authority is certainly incidental to his duties; indeed, it is an integral part of them....
>
> It follows that the employer/government must be responsible for acts done during the exercise of this authority.
>
> . . . .
>
> The use of authority is incidental to the duties of a police officer. The County enjoys tremendous benefits from the public's respect for that authority.

Therefore, it must suffer the consequences when the authority is abused. *Id.* 212 Cal.Rptr. at 496.

The Louisiana Court of Appeal reached the same conclusion in *Applewhite v. City of Baton Rouge*, 380 So.2d 119 (La.Ct.App. 1979):

> A police officer is a public servant given considerable public trust and authority. Our review of the jurisprudence indicates that, almost uniformly, where excesses are committed by such officers, their employers are held to be responsible for their actions even though those actions may be somewhat removed from their usual duties.

*Id.* at 121. The police officers in *Applewhite* had picked up a young woman in their patrol car and sexually assaulted her.

Police officers are different from other government employees. Government gives them badges, uniforms, specially marked vehicles, and the authority to use force to ensure compliance with their directions. Further, and more significantly, it represents to the public that trust may be safely reposed in these particular government representatives.[1] Government depends on the cooperation and acquiescence of the citizenry in law enforcement activities. In order to further its own ends in that regard, government must be able to represent that officers are trustworthy and should be obeyed in all circumstances in which they purport to be exercising police authority. The price government should pay for such representations is responsibility for the abuse of the special relationship between officer and citizen that it itself has established and encouraged.

The concept that government should bear the risk of harm to citizens that occurs because of something government itself has done (i.e., holding out police officers as worthy of trust and obedience when they purport to be acting as officers) is akin to principles of apparent authority

---

1. I note, for example, the widespread public relations program operated in the community and the public schools by the Salt Lake City Police Department on behalf of "Officer Friend-ly," in which children are encouraged to regard police officers as "community helpers" and protectors.

**130**

summarized in section 267 of the Restatement (Second) of Agency (1957):

One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

The majority opinion's description of the facts in this case makes clear that Officer Lyday molested plaintiff in Lyday's capacity as a police officer: "J.H. was informed that it was imperative that he give strict obedience to all police officers working with the program. . . . Lyday committed the acts after telling J.H. that he was teaching him standard and accepted relaxation techniques which police officers relied upon to deal with stress in the occupation." Lyday was able to accomplish his assault on plaintiff *specifically because of* the authority that West Valley City had given him and the trust and obedience that West Valley City had deliberately encouraged (in fact, demanded as a condition of participation in its program) from plaintiff. The authority by which Lyday committed this offense was not his personally; it was governmental authority conferred upon him by the City.

I have emphasized that police officers are different, even unique, in the degree of power and authority they exercise on behalf of their employer, because I wish to anticipate concerns that the principle of vicarious liability I advocate might extend to others in positions of public authority. I note that the California Supreme Court recently rejected the argument that school teachers are like police officers in that context, saying:

Furthermore, invoking respondeat superior here would raise an entirely different specter of untoward consequences, or interference with the purposes for which authority was conferred in the first place, than might result from the imposition of vicarious liability in the limited context of a police officer's abuse of authority.

*John R. v. Oakland Unified School Dist.,* 48 Cal.3d 438, 256 Cal.Rptr. 766, 775, 769 P.2d 948, 957 (1989). I would likewise limit the principle.

The police officer in this case was exercising authority pursuant to his employment assignment from West Valley City. Because of that authority and employment, plaintiff was harmed; I would hold that the City may be held liable for that harm.